No. 22-1910

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**JAMIE LUSKIN,**

*Plaintiff-Appellant*,

v.

**UNIVERSITY OF MARYLAND, COLLEGE PARK,**

*Defendant-Appellee*.

_____

On Appeal from the United States District Court for the District of Maryland
(Paula Xinis, District Judge)

_____

**BRIEF OF APPELLEE**

_____

BRIAN E. FROSH
Attorney General of Maryland

KATHRYN J. BRADLEY
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 17th Floor
Baltimore, Maryland 21202
kbradley@oag.state.md.us
(410) 576-6449
(410) 576-6437 (facsimile)

December 15, 2022                    Attorneys for Defendant-Appellee

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __22-1910__          Caption: __Jamie Luskin v. University of Maryland College Park__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__University of Maryland College Park__
(name of party/amicus)

_____

 who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.      Does party/amicus have any parent corporations?     ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
       If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
       If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
       If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
       If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Kathryn J. Bradley          Date:    August 6, 2022

Counsel for: University of Maryland College Park

Print to PDF for Filing

# TABLE OF CONTENTS

Page

ISSUES PRESENTED FOR REVIEW ...................................................................1

STATEMENT OF THE CASE ............................................................................2

    Ms. Luskin Matriculates in the Chemical Physics Ph.D. Program ................2

    Office of Civil Rights and Sexual Misconduct ...............................................3

    Office of Student Conduct ...............................................................................4

    BETA Team........................................................................................................5

    Ms. Luskin's Report to OCRSM .....................................................................6

    The May 8 Incident Reported to BETA Team ...............................................10

    OCRSM's Review of Ms. Luskin's May 9 Report .......................................11

    Actions Taken by the Office of Student Conduct .........................................13

    Ms. Luskin Reports that C.H. Violated the No Contact Order ....................16

    C.H. Is Disciplined for His Behavior ...........................................................18

    C.H.'s Behavior Was Not "Stalking" Under Title IX ..................................19

    Ms. Luskin Performed Well in Her Classes and Research............................21

SUMMARY OF ARGUMENT................................................................................21

I.     THE STANDARD OF REVIEW IS DE NOVO.......................................................22

II.    THE DISTRICT COURT PROPERLY ENTERED SUMMARY JUDGMENT BECAUSE THE UNDISPUTED MATERIAL FACTS DEMONSTRATE THAT THE UNIVERSITY WAS NOT DELIBERATELY INDIFFERENT TO SEXUAL HARASSMENT. ..............................................................................................23

    A.    University Responses to Ms. Luskin's Reports Were Reasonable.
         ..........................................................................................................25

B.  The Determination that C.H.'s Conduct Did Not Constitute Sexual Harassment Was Not Clearly Unreasonable. ...........................29

C.  The University Was Not Deliberately Indifferent in Declining to Implement Ms. Luskin's Preferred Disciplinary Sanctions. ...............33

III.  THE JUDGMENT SHOULD BE AFFIRMED FOR THE ALTERNATIVE REASONS THAT C.H.'S CONDUCT WAS NOT SO SEVERE, PERVASIVE, AND OBJECTIVELY OFFENSIVE THAT IT DEPRIVED MS. LUSKIN OF ACCESS TO EDUCATIONAL OPPORTUNITIES OR BENEFITS *AND* WAS NOT BASED ON HER SEX. ...................................................................................................35

A.  No Reasonable Juror Could Find that Ms. Luskin Met the Applicable Standard. ...........................................................................35

B.  C.H.'s Conduct Toward Ms. Luskin Was Not Based on Her Sex. ....................................................................................................40

CONCLUSION ...........................................................................................44

REQUEST FOR ORAL ARGUMENT ......................................................45

CERTIFICATE OF COMPLIANCE .........................................................45

TEXT OF PERTINENT PROVISIONS ....................................................46

# TABLE OF AUTHORITIES

Page

## Cases

*Bowman v. Shawnee State Univ.*, 220 F.3d 456 (6th Cir. 2000) .............................41

*Butters v. James Madison Univ.*, 208 F. Supp. 3d 745 (W.D. Va. 2016)...............34

*Cummings v. Premier Rehab Keller, PLLC*, 142 S. Ct. 1562 (2022).....................23

*Davis ex rel. LaShonda D. v. Monroe County Bd. of Educ.*,
526 U.S. 629 (1999).........................22, 23, 24, 25, 26, 27, 30, 33, 34, 35, 36, 38

*Doe v. Board of Educ. of Prince George's County*, 605 F. App'x 159
(4th Cir. 2015)........................................................................................... 28, 31

*Doe v. Board of Educ. of Prince George's County,* 982 F. Supp. 2d 641
(D. Md. 2013), *aff'd*, 605 F. App'x 159 (4th Cir. 2015) ...................................43

*Doe v. University of Chicago*, No. 16 C 08298, 2017 WL 4163960
(N.D. Ill. Sept. 20, 2017) ...............................................................................40

*Doe v. University of Ky.*, 959 F.3d 246 (6th Cir. 2020)...........................................37

*Feminist Majority Found. v. Hurley*, 911 F.3d 674 (4th Cir. 2018).......................28

*Foster v. Board of Regents of Univ. of Mich.*, 982 F.3d 960 (6th Cir. 2020)..........28

*Frazer v. Temple Univ.*, 25 F. Supp. 3d 598 (E.D. Pa. 2014).................................37

*Garrett v. Univ. of South Fla. Bd. of Trs.*, 824 F. App'x 959
(11th Cir. 2020)...............................................................................................28

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) ......................... 24, 31

*Goodman v. Diggs*, 986 F.3d 493 (4th Cir. 2021) ..................................................22

*Haulbrook v. Michelin N. Am.*, 252 F.3d 696 (4th Cir. 2001)................................23

*I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360 (5th Cir. 2019)..........................27

*Jennings v. University of N.C.,* 482 F.3d 686 (4th Cir. 2007)............. 35, 38, 39, 43

*Johnson v. Northeast Sch. Corp.*, 972 F. 3d 905 (7th Cir. 2020) ..................... 27, 28

*Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093 (9th Cir. 2020)............... 27, 31

*Maher v. Iowa State Univ.*, 915 F.3d 1210 (8th Cir. 2019) ............................. 27, 28

*Neal v. E. Carolina Univ.*, 53 F.4th 130 (4th Cir. 2022) ..........................................22

*Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345 (S.D.N.Y. 2017)...................41

*Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75 (1998) .................... 35, 41

*Ramser v. University of San Diego*, 779 F. App'x 466 (9th Cir. 2019) .................28

*Roe ex rel. Callahan v. Gustine Unified Sch. Dist.*, 678 F. Supp. 2d 1008
   (E.D. Cal. 2009)...............................................................................................28

*S.B. ex rel. A.L. v. Board of Educ. of Harford County,* 819 F.3d 69
   (4th Cir. 2016).......................................................................................... 27, 33

*Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156
   (5th Cir. 2011)........................................................................................... 31, 41

*Seamons v. Snow*, 84 F.3d 1226 (10th Cir. 1996)...................................................41

*Theno v. Tonganoxie Unified Sch. Dist. No. 464*, 394 F. Supp. 2d 1299
   (D. Kan. 2005)...................................................................................................28

*United States v. Swann*, 149 F.3d 271 (4th Cir. 1998) ............................... 23, 40, 44

## Statutes

20 U.S.C. § 1681(a) ...............................................................................................23

No. 22-1910

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

### JAMIE LUSKIN,

*Plaintiff-Appellant*,

v.

### UNIVERSITY OF MARYLAND, COLLEGE PARK,

*Defendant-Appellee*.

_____

On Appeal from the United States District Court for the District of Maryland
(Paula Xinis, District Judge)

_____

### BRIEF OF APPELLEE

_____

### ISSUES PRESENTED FOR REVIEW

1.    Did the district court correctly enter judgment for the University because no reasonable factfinder could conclude that C.H.'s alleged harassment deprived Ms. Luskin of educational opportunities or benefits and no reasonable juror could find that the University's response was deliberately indifferent or "clearly unreasonable" under the circumstances?

2. Should the district court's judgment be affirmed on the alternative grounds that C.H.'s actions toward Ms. Luskin were not severe, pervasive, and objectively offensive and were not based on her sex?

## STATEMENT OF THE CASE

### Ms. Luskin Matriculates in the Chemical Physics Ph.D. Program

Appellant Jamie Luskin enrolled in the Chemical Physics Ph.D. program at the University of Maryland, College Park (the "University"), appellee, in the fall of 2017. (J.A. 358-359.) Approximately five other students, including C.H.,[1] started the program with her. (J.A. 359-361.) Students in such small programs, sometimes referred to as graduate cohorts,[2] tend to become close to each other in their study habits, relationships, and social lives. (J.A. 240.) In March 2017, before the program began, members of Ms. Luskin's cohort emailed their cell phone numbers to one another in order to coordinate lab visits. (J.A. 387-388.) Thus, C.H. had access to Ms. Luskin's cell phone number and she had access to his. (J.A. 387-388.)

While Ms. Luskin contends that she was not a friend to any other student in her cohort, she was friends with other graduate students in classes that she had in

---

[1] The parties have agreed to use initials instead of C.H.'s full name; his identity is protected by the Stipulated Discovery Confidentiality Order. (ECF No. 13.)

[2] "Cohort" refers to the group of people who started the Ph.D. program at the same time. These graduate students go through orientation together and may take initial classes and progress through the program together. (J.A. 143-144, J.A. 359.)

common with C.H. (J.A. 362-363), and took part in a study group with those students (specifically, Eli Mizrachi, Donny Pearson, and Jessie Hankes) (J.A. 369). Conversely, C.H. seemed rather lonely and isolated from other graduate students. (J.A. 423.) Ms. Luskin did not know if C.H. was in a study group with other students nor if he had any friends in the graduate program, and she never saw him either interacting with any graduate students or outside the University's campus. (J.A. 369-370, J.A. 373-374.) During their first year in the program, Ms. Luskin shared an office with C.H.; although she saw him in classes a couple of times per week and in the lobby of their academic building, she never spoke with him except to say "hello." (J.A. 367, J.A. 373-376.)

### Office of Civil Rights and Sexual Misconduct

The Office of Civil Rights & Sexual Misconduct (the "OCRSM") administers the University's Sexual Misconduct Policy & Procedures, which govern reports of sexual misconduct. (J.A. 35-66.) After receiving a complaint of student-on-student sexual misconduct, OCRSM conducts an "Initial Assessment" to "determine whether the reported conduct constitutes a potential violation of the Policy, whether further action is warranted based on the reported conduct, and whether the University has jurisdiction over the parties." (J.A. 54.) "When the Initial Assessment determines the reported conduct does not constitute a potential violation under the Policy but may violate other University policy, the complaint may be

referred to another appropriate University official for review and resolution." (J.A. 54.)

Upon submission of a report of sexual misconduct to OCRSM, its director determines whether the report falls under the Sexual Misconduct Policy & Procedures. (J.A. 116-117, J.A. 231-235.) Catherine Carroll, who served approximately five years (J.A. 228) as the University's Director of OCRSM and the Title IX Officer, made such determinations "every day, five days a week" (J.A. 231), in consultation with her team (J.A. 116-117, J.A. 231-235, J.A. 249-250, J.A. 254).

### Office of Student Conduct

From 2010 through November 2020, Dr. Andrea Goodwin served as Director of the University's Office of Student Conduct (the "OSC"). (J.A. 96.) OSC oversees all policies related to student behavior on campus, including the Code of Student Conduct (the "Code"). (J.A. 98.) The Code outlines behaviors inconsistent with University standards and expectations, and sets forth applicable procedures and potential sanctions governing violations. (J.A. 272.) The only University office holding authority to sanction students for violations of the Code and Sexual Misconduct Policy & Procedures, OSC also stands as the sole University entity with authority to issue no contact orders. (J.A. 101-102.)

Dr. Goodwin also worked as a Deputy Title IX Coordinator, and she had extensive experience and training in Title IX issues. (J.A. 103-111.) Her

responsibilities included sanctioning students in the event that a sexual misconduct report proceeded to hearing and resulted in findings.  (J.A. 104-105.)

**BETA Team**

The University's Behavior Evaluation and Threat Assessment ("BETA") team evaluated and responded to reports about students who were worrisome, concerning, disruptive, or threatening.[3]  (J.A. 309-310.)  Comprising the team were individuals from the Office of Student Affairs, University police department, OSC, Counseling Center, and Mental Health Services.  (J.A. 124, J.A. 310.)  The team's composition enabled it to take immediate action if there were students of concern.  (J.A. 123, J.A. 311-312.)  Additionally, should the BETA team believe that a report involved issues of sexual misconduct, the matter could be referred to OCRSM.[4]  (J.A. 121-22, J.A. 313.)

---

[3] The University concurs with Ms. Luskin's view that the district court inaccurately found that "[t]ypically, all complaints are first routed through the BETA Team."  (J.A. 532); Appellant's Br. at 4.  Individuals could make complaints and reports directly to OSC or OCRSM, without reporting such conduct to the BETA team.  (J.A. 42-43, J.A. 277.)  However, Ms. Luskin incorrectly asserts that the BETA team "dealt with student-related concerns that were **not** disciplinary in nature."  Appellant's Br. at 4 (emphasis in original).  Rather, the BETA team assesses reports of student behavior where it is not initially clear whether the conduct should be reported to OSC, OCRSM, or University police.  (J.A. 312-313.)

[4] Dr. Marta Hopkinson served on the BETA team and had significant experience dealing with sexual assault and in sexual assault prevention. (J.A. 124-125.)

**Ms. Luskin's Report to OCRSM**

On May 9, 2018, Ms. Luskin filed a report with OCRSM about an incident involving C.H. that occurred on May 8, 2018. (J.A. 555-559.) In that report, Ms. Luskin described C.H. as "very withdrawn and not socially well-acclimated in the department." (J.A. 556.) She also set forth a February 2018 incident during which C.H. approached her and fellow graduate student friends in the graduate student lounge and "came up to the door, punched it, and started screaming profanities at" them. (J.A. 556.) And she recounted an April 2018 incident occurring in the office shared with C.H., where C.H. confronted her with a "list of grievances" and was "unreasonably upset with" her, "fixating on [her] in a very irrational way." (J.A. 556.) She indicated that the April incident ended because "knowing how he acted towards us in February, I felt very threatened and like I had to get out of the situation[,] so I said that I had to go and left the building." (J.A. 556.) C.H. did not follow Ms. Luskin out of the building. (J.A. 384.)

Additionally, Ms. Luskin's report advised OCRSM that the BETA team knew about the February and April incidents and had contacted the Physics Department Chair, the professor for whom C.H. conducted research, and a few other administrators to gauge their awareness of any strange behavior by C.H. (J.A. 556.) None had noted any strange behavior or concerns about C.H. (J.A. 77-78, J.A. 456.)

6

The BETA team learned of the February 2018 incident through a report from graduate student Eli Mizrachi.  He revealed that he and a few other graduate students observed C.H. yelling and slamming his fist against a wall.  (J.A. 315, J.A. 561-562.) Mr. Mizrachi described his main concern as C.H.'s well-being, and requested that the BETA team keep his report confidential and not share it with C.H.  (J.A. 315, J.A. 562.)  Ms. Luskin believed that C.H. punched the wall and screamed because he thought that the other students were laughing at him, although in fact they were amused by something totally unrelated.  (J.A. 376.)  C.H. said nothing directly to Ms. Luskin during this incident.  (J.A. 377.)

Upon receipt of this February report, the BETA team notified relevant faculty members and discussed the situation.  (J.A. 456.)  Because no prior issues or concerns regarding C.H. existed, the BETA team determined that the proper course of action was to monitor the situation.  (J.A. 316-317.)

The referenced April 2018 incident was reported by both Ms. Luskin and Mr. Mizrachi to the BETA team.  Mr. Mizrachi spelled out his impression that C.H. felt isolated among graduate students and believed that the other students had formed a "high school like clique" where they made fun of him.[5]  (J.A. 77, J.A. 564.) Similarly, Ms. Luskin reported to the BETA team her concerns about a brief

---

[5] Mr. Mizrachi made it clear to Dr. Peter Shawhan that *he* and Ms. Luskin both felt targeted by C.H.  (J.A. 564.)  In response, Dr. Shawhan proposed solutions to help Mr. Mizrachi, Ms. Luskin, and C.H.  (J.A. 569.)

conversation with C.H. in which he seemed fixated on believing that she had been excluding him from the group.  (J.A. 380-385.)

None of C.H.'s comments to Ms. Luskin during this April conversation was sexual in nature, and C.H. said nothing about wanting to date her.  (J.A. 382-383.) C.H. texted Ms. Luskin on April 12, 2018, asking that their interaction not be shared with other students, and saying, "I don't want to feel like you've been gossiping and making fun of me with your group, especially Eli."  (J.A. 10, J.A. 567, J.A. 572.) And nothing in his text message was based on gender or sex.  (J.A. 572.)  After this incident, Dr. Paul Lett, Ms. Luskin's faculty advisor, helped in moving her into a new office so that she no longer had to share an office with C.H.[6]  (J.A. 389-390.)

The concerns Ms. Luskin and Mr. Mizrachi reported in April 2018 were shared with the entire BETA team and University police.  (J.A. 78.)  Additionally, case manager Lonsbury reached out to five of C.H.'s professors to ascertain if they had any issues or concerns; none reported any concerns about C.H.  (J.A. 78.)

The third event described in Ms. Luskin's May 9 report to OCRSM occurred on the previous day, as follows:

> Yesterday, I was doing homework around 1:15/1:30 PM in the Physical Sciences Complex in between classes. [C.H.] was in the lobby as well, and I focused on my work and kept to myself to avoid an uncomfortable interaction. A few minutes after he walked out of the building, he

---

[6] Maria Lonsbury, case manager for the BETA team, also reached out to Ms. Luskin's professors to ascertain if her office could be moved, but arrangements to move her office had already been made.  (J.A. 69, J.A. 78.)

started sending me a series of texts accusing me of ignoring him, manipulating people around me, and very irrational things. I will attach these. I have received absolutely no guidance from anyone at the university despite having reported things to the BETA team about how to handle these text messages in general. I saw that it was setting him off for me to not respond (he obsessively brought this up). I decided I had nothing to lose by engaging in some dialogue. He talked about specific things that I have done to upset him and they are all pretty detached from reality. Then he complimented my looks and started strangely fixating on certain physical things about me; in this case a ring that I wear. He seems to be under the delusion that it had something to do with him. I wanted it to be on record that I have been clear about this, so I sent him a text dismissing that notion and stating that I am in a relationship and am not seeking anything with anyone else. He started asking me questions about my boyfriend, whether he is a student, the dates he takes me on, and a series of things that you will see in the attached files. At this point I stopped responding as I didn't want to provoke him.

(J.A. 556, J.A. 406-408.)  Ms. Luskin attached 16 screenshots of the text messages and an email to her report.[7]  (J.A. 406-407.)  These text messages revealed a conversation between Ms. Luskin and C.H. in which he asked why she had been excluding him from the group.  (J.A. 575-591.)  Ms. Luskin did not tell C.H. to stop sending her text messages.  (J.A. 391-392, J.A. 394-399, J.A. 574-592.)  Among other things, C.H. said in one message, "Maybe if you weren't one of the few who happen to share the same year and department with me I'd not care, but I thought we would have grown to have been good friends and taken on grad school together as a

---

[7] The email, from March 2017, concerned the graduate students sharing their cell phone numbers with one another before the start of the Ph.D. program.  (J.A. 387-388, J.A. 407.)

team." (J.A. 582, J.A. 583.)  During the conversation, C.H. asked why Ms. Luskin wore a ring on her index finger, and in response, Ms. Luskin told C.H. that she was "in a serious relationship" and "not seeking anything with anyone here outside of that." (J.A. 589-590, J.A. 745-746.)  C.H. replied with questions about Ms. Luskin's romantic relationship and said, "I only wish I could be that person for someone." (J.A. 594, J.A. 746-747.)

**The May 8 Incident Reported to BETA Team**

Prior to reporting the incident to OCRSM, Ms. Luskin described it to Ms. Lonsbury of the BETA team.  (J.A. 78-79.)  With Ms. Luskin visibly upset during this meeting, Ms. Lonsbury first contacted, then personally escorted her to, the University's Counseling Center, where she was immediately seen by a counselor. (J.A. 78-79, J.A. 401-402.)  Ms. Lonsbury next sent an email to C.H. instructing him to meet with Dr. John Zacker[8] to discuss Ms. Luskin's report.  (J.A. 78-79.)  Later that day, Ms. Luskin emailed Ms. Lonsbury, thanking her for the help and advising of her intent to file a report with OCRSM the next day.  (J.A. 78-79.)

Upon receipt of Dr. Zacker's email, C.H. texted Ms. Luskin; he asked why she reported him to Student Affairs and if she was trying to make his life more difficult.  (J.A. 408, J.A. 594.)  Next, in several back-and-forth text messages, C.H.

---

[8] Dr. Zacker served as Assistant Vice President of Student Affairs and Chair of the BETA team.  (J.A. 309, J.A. 459.)

sought clarification as to whether Ms. Luskin wanted to communicate with him further.  (J.A. 594-595.)  The final message in this exchange occurred three hours later, when C.H. responded to Ms. Luskin's earlier text with a question: "Do you not want me talking to you at all?"  (J.A. 595.)  Nothing in the text exchanges of May 9 was based on sex or gender.  (J.A. 594-595.)

**OCRSM's Review of Ms. Luskin's May 9 Report**

OCRSM determined that Ms. Luskin's May 9 sexual misconduct report regarding C.H. did not fall under the purview of Title IX and the Sexual Misconduct Policy & Procedures because it failed to allege sexual, sex-based, or gendered conduct.  (J.A. 239, J.A. 241-244, J.A. 252.)  Given that the allegations did not rise to the level of sex-based conduct, meaning "no gendered language, no repeated trying to date, no prior dating history" (J.A. 242-243), OSCRM concluded that it lacked jurisdiction to investigate the complaint (J.A. 239-244, J.A. 252).  This determination resulted in OCRSM referring the matter to OSC for review under the Code.  (J.A. 239, J.A. 247.)

OCRSM's Catherine Carroll explained why she determined that the text messages were not based on sex or gender.  According to Ms. Carroll, those texts related to the cohort dynamic where C.H. appeared to be blaming Ms. Luskin for his exclusion from the group.  (J.A. 261-262.)  Ms. Carroll noted that nothing in the text messages indicated that C.H. had a romantic interest in Ms. Luskin.  (J.A. 267.)  The

fact that Ms. Luskin mentioned that she was in a "serious relationship," and C.H. then asked questions about her relationship, did not indicate that C.H. had a romantic interest in Ms. Luskin; Ms. Carroll testified that she often saw similar situations where students were overly inquisitive about other students' lives.  (J.A. 257-258.) Ms. Carroll also found Ms. Luskin's report that C.H.'s "statements made it apparent that he is fixating on me in a very irrational way" did not rise to the level of "stalking" under the Sexual Misconduct Policy & Procedures; she reasoned that Ms. Luskin did not state that C.H. fixated on her because he wanted to date her or had a romantic interest in her.  (J.A. 259-260.)  Indeed, C.H. never told Ms. Luskin that he wanted to date her or be her boyfriend.  (J.A. 432-433.)  Lastly, Ms. Carroll did not view the fact that Ms. Luskin is female and C.H. is male to mean that the reported conduct was based on sex.  (J.A. 242.)  When Ms. Carroll referred the case to OSC and requested that a no contact order be issued, she made clear that "this is NOT a Title IX case" because C.H. and Ms. Luskin "have no prior relationship and what she is reporting is not sexual misconduct." (J.A. 597.)

Dr. Goodwin agreed with Ms. Carroll's assessment that Ms. Luskin's May 9, 2018, complaint did not implicate Title IX and therefore did not support application of the University's Sexual Misconduct Policy & Procedures.  (J.A. 151, J.A. 163-164.)  Accordingly, C.H.'s behavior was treated as a student Code issue.  (J.A. 156-157.)

**Actions Taken by the Office of Student Conduct**

OSC issued a no contact order on May 10, 2018, which was immediately served on C.H. (J.A. 79, J.A. 156-157, J.A. 600.) The order instructed C.H. that:

> Effective immediately you are directed to not have any indirect or direct contact with Jamie Luskin. This means you are to have no contact via in person, telephone, postal mail, any electronic means, or third-party communications with Jamie Luskin. Please be advised any attempts to commit acts in violation of this order will be punished to the same extent as completed violations. Failure to abide by the NO CONTACT ORDER will result in disciplinary action.

(J.A. 600.) The no contact order was to remain in place until C.H. and/or Ms. Luskin graduated. (J.A. 168.)

Following the order's issuance, Dr. Goodwin immediately reached out to both Ms. Luskin and C.H. to schedule meetings to discuss the directive.[9] (J.A. 130, J.A. 600, J.A. 602.) Dr. Goodwin met with C.H. for more than an hour, explaining the meaning of the no contact order and potential consequences for violations. (J.A. 130-131.) Dr. Goodwin told C.H. that Ms. Luskin had made a complaint of receiving unwanted verbal contact and text messages and that she no longer wished to engage with him electronically or in person. (J.A. 145-146.)

Dr. Goodwin found C.H. to be shy and quiet, and he sensed that C.H. felt isolated from the other members of his cohort. (J.A 139.) Specifically, C.H. seemed

---

[9] Ms. Luskin never responded to this meeting request from Dr. Goodwin. (J.A. 137-138.)

envious of Ms. Luskin's popularity and her ability to make friends.  (J.A. 139-140, J.A. 699.)  C.H. said that upon starting the Ph.D. program, he expected that its students would be friends because they all began a very small, difficult program together.  (J.A. 139-140.)  C.H. told Dr. Goodwin, "I'm not really part of that group, Jamie has a lot of friends and everybody seems to rally around her and congregate around her" (J.A. 140), and "I don't know why she ignores me, you know, I'm one of the group, too." (J.A. 140.)  Dr. Goodwin suggested that C.H. obtain counseling and attempt to connect with other students on campus who shared similar interests.  (J.A. 141.)  C.H. did not deny that he sent the text messages to Ms. Luskin.  (J.A. 139.)  Dr. Goodwin never thought that C.H. had any romantic feelings for Ms. Luskin.  (J.A. 142-143, J.A. 200.)  It appeared to Dr. Goodwin that C.H. wanted to make friends, felt left out, and Ms. Luskin was the popular one in the group.[10]  (J.A. 142-143, J.A. 200.)

Following Dr. Goodwin's meeting, Dr. Zacker also met with C.H. to discuss Ms. Luskin's complaint.  (J.A. 74, J.A. 318-319.)  Dr. Zacker found C.H. to be a relatively odd young man who was trying to connect with others.  (J.A. 321.)  He did not hear or see any behavior by C.H. causing concern for the safety of others.  (J.A. 321.)  Additionally, Dr. Zacker reviewed the text message exchange between

---

[10] Ms. Luskin incorrectly asserts that Dr. Goodwin "admitted at her deposition that C.H. had refused to answer a question about his romantic interest in [Ms.] Luskin."  Appellant's Br. at 9.  Dr. Goodwin made no such admission. (J.A. 200.)

Ms. Luskin and C.H., not finding the exchange inappropriate, but rather only odd. (J.A. 322.) Dr. Zacker did not conclude that Ms. Luskin's allegations about C.H. constituted stalking because the interactions between the two were not directed solely towards her; Mr. Mizrachi and the other students in the program had similar concerns. (J.A. 327-328.) Dr. Zacker followed up with C.H. in September 2018 and reported that C.H. appeared in good health and posed no concerns to others. (J.A. 80, J.A. 331.)

The University advised Ms. Luskin's professors of the no contact order and worked to keep C.H. and Ms. Luskin apart. Professors arranged for Ms. Luskin to take an exam in a separate room from C.H. and changed what initially were required to be oral presentations to written presentations, so that contact between Ms. Luskin and C.H. could be avoided. (J.A. 413-416.) Aware of the situation, C.H.'s faculty advisor, Dr. Wendell Hill, was willing to facilitate any mental health support that C.H. might need and monitor the situation between C.H. and Ms. Luskin. (J.A. 608.) As to the final qualifying exam in August, where all students were required to be in the same room, Ms. Luskin asked for reassurance of a professor's presence for the entirety of the time that she and C.H. took the exam; the University gave her that assurance. (J.A. 611.) No problems or issues surfaced during the exam. In fact, from the date that the no contact order was issued in May until mid-October, Ms.

Luskin had no interactions or issues with C.H., and no other reports or concerns about him occurred.  (J.A. 80, J.A. 411-412, J.A. 416-418.)

**Ms. Luskin Reports that C.H. Violated the No Contact Order**

In mid-October 2018, Ms. Luskin reported that C.H. violated the no contact order.  (J.A. 171-172.)  The violation occurred when Ms. Luskin and her colleague, Donny Pearson, were in their office and C.H. walked up to the doorway, yelled, and asked Mr. Pearson about the order. (J.A. 418-419, J.A. 718.)  C.H. appeared angry and upset, complaining that Ms. Luskin excluded him from the group and did not pay any attention to him.  (J.A. 421, J.A. 718.)  During this brief exchange (J.A. 425-426), C.H. asked Mr. Pearson about his relationship with Ms. Luskin and appeared fixated on whether she had friendships with other men (J.A. 421-423, J.A. 718). Both Mr. Pearson and Ms. Luskin then reported concerns about the manner that C.H. treated each of them.  (J.A. 182-183.)

Ms. Luskin went directly to the University police station to file a report, before walking to the OCRSM.  (J.A. 426.)  The OCRSM's Mark Nelms met with Ms. Luskin and developed a safety plan with her; he recommended she file a peace order in the District Court for Prince George's County to secure protection both inside and outside the University.  (J.A. 73, J.A. 428-429.)  After Ms. Luskin left his office, Mr. Nelms filed a report with OSC stating that C.H. had violated the no contact order. (J.A. 73-74, J.A. 612-613.)

Upon receipt of Mr. Nelms's report, Dr. Goodwin immediately contacted C.H., told him that he was forbidden to go to class, and directed that he immediately schedule an appointment with her.  (J.A. 74, J.A. 176-178.)  A meeting was held with C.H., Dr. Goodwin, and University police sergeant William Mable (J.A. 183), where it was determined that C.H. could not go to class, could not be present in his lab, office, or the Atlantic building, and needed to be examined by the University's psychiatrist (J.A. 177, J.A. 616).

Questioned about his violation of the no contact order, C.H. explained to Dr. Goodwin that Ms. Luskin happened to be in the same room as he was speaking with Ms. Luskin's friend Donny.  (J.A. 180-181.)  C.H. did not deny that he violated the order, and he agreed to be evaluated by the psychiatrist.  (J.A. 189.)  Director of Psychiatry Dr. Marta Hopkinson performed that evaluation and concluded that C.H. was not a danger to himself or others.  (J.A. 75, J.A. 190-191.)

Additionally, Dr. Goodwin implemented a safety plan so that C.H. would not come into physical contact with Ms. Luskin.  Among other things, this safety plan mandated that C.H. not take any classes with Ms. Luskin and he take all his classes online.  (J.A. 178, J.A. 197-198.)  C.H. was restricted in his access to the Atlantic Building (requiring that he enter and exit through a specific door and use a specific set of stairs), and he was ordered not to enter Ms. Luskin's research lab.  (J.A. 74-

75, J.A. 178, J.A. 197-198.)   These measures were all implemented so that Ms. Luskin did not come into physical contact with C.H.  (J.A. 178.)

After his meeting with University officials, and entry of the final peace order by the Prince George's County District Court,[11] C.H. sent an email to Sgt. Mable, copying Dr. Goodwin and Dr. Hill; C.H. attached a copy of the peace order, outlined its details, and committed to comply with it.  (J.A. 75, J.A. 618.)  Dr. Goodwin followed up with C.H.'s and Ms. Luskin's professors to ensure compliance with the peace order.  (J.A. 618.)

### C.H. Is Disciplined for His Behavior

C.H. was sanctioned and placed on disciplinary probation for violating the no contact order.  (J.A. 76, J.A. 81, J.A. 177.)  Disciplinary probation removed C.H. from good standing with the University, and he faced suspension or expulsion for further violation of the no contact order.  (J.A. 76, J.A. 81, J.A. 177-178, J.A. 622-623.)

In reviewing a no contact order violation, OSC examines circumstances leading to the violation, the alleged violator's explanation, and the normal responses to similar situations.  (J.A. 197.)   Dr. Goodwin believed disciplinary probation to be the proper sanction for C.H. because the situation involved a one-time violation

---

[11] On October 24, 2018, C.H. consented to entry of the peace order without admitting the allegations in the petition and without a judicial finding.  (J.A. 620.)

of the no contact order, C.H. acknowledged responsibility, and C.H. stressed the importance of his academic studies and his commitment to complying with the order. (J.A. 206-207.) A single violation of a no contact directive typically would not result in a suspension or an expulsion. (J.A. 197.) And, in all her experience, Dr. Goodwin has never seen a student suspended or expelled for a one-time violation of a no contact order. (J.A. 207.)

Dr. Goodwin informed Ms. Luskin of C.H.'s disciplinary probation sanction and that he would face additional disciplinary measures, including dismissal, for another violation of the no contact order. (J.A. 203-204.) There is no indication in the record that Ms. Luskin had any further interactions or problems with C.H. after he violated the no contact order in October 2018.

### C.H.'s Behavior Was Not "Stalking" Under Title IX

OCRSM Director Carroll and OSC Director Goodwin were the University officials tasked with interpreting and enforcing the Sexual Misconduct Policy and the Code. Both concluded that Ms. Luskin's allegations did not constitute "stalking" under the Sexual Misconduct Policy & Procedures because the contentions were not based on her sex or gender. (J.A. 207-208, J.A. 243-245, J.A. 251-254.) Sex-based allegations would include gendered language, unreciprocated romantic or sexual attraction, or a prior romantic or sexual relationship. (J.A. 252-254.)

The Sexual Misconduct Policy defines "stalking" as "repeated, unwanted attention; physical, verbal, or electronic contact; or any other course of conduct directed at an individual that is sufficiently serious to cause physical, emotional, or psychological fear or to create a hostile, intimidating, or abusive environment for a reasonable person in similar circumstances and with similar identities." (J.A. 40.) Stalking requires a pattern of conduct in which one person targets another. (J.A. 235-236.) The conduct is usually quite pervasive. (J.A. 235-236.) In evaluating whether actions amount to stalking, the factors for review include "how many times did this person do it, over what period of time, what was the duration, were they with other people, did they say anything." (J.A. 238-239.) Previous stalking cases handled by OCRSM encompassed elements such as "hundreds of text messages, unrequited love," and threatening conduct. (J.A. 235-236.) Such conduct might include the stalker appearing randomly where he or she should not be and following another student from class to class. (J.A. 235-236.)

Ms. Luskin admits that C.H. never showed up at her apartment, attempted to contact her boyfriend, asked her out on a date, or asked her to be his girlfriend. (J.A. 432-433.) In fact, Ms. Luskin never saw C.H. outside the University's campus. (J.A. 373-374.) She does not know if C.H. prefers to date men over women, and has no idea about C.H.'s sexual orientation. (J.A. 422-423.) And Ms. Luskin does not point to any specific comment by C.H. on her physical appearance, such as her hair, eyes,

or body (J.A. 433-434), although she claims that an observation he made about a ring she wears constitutes a physical appearance comment (J.A. 433).

### Ms. Luskin Performed Well in Her Classes and Research

For her entire time at the University, Ms. Luskin's academic achievement and research work were stellar; she described her grades and research as "consistently good." (J.A. 435-436.) She left the University in spring 2019 with a master's degree in Chemical Physics. (J.A. 353-354.) Towards the end of 2019, Ms. Luskin decided to re-enroll in the University's Chemical Physics Ph.D. program. (J.A. 352-353.) Currently, Ms. Luskin is proceeding with her academic studies and research in California as she continues working on her Ph.D. degree from the University. (J.A. 441.)

### SUMMARY OF ARGUMENT

Graduate student Jamie Luskin alleges that the University is liable to her for monetary damages under Title IX because it was deliberately indifferent to her claims of sexual harassment by C.H., another graduate student. The undisputed material facts show that C.H. was a socially awkward student who felt excluded by his colleagues and erupted in anger at Ms. Luskin and other graduate students. A university may only be liable for student-on-student harassment if (1) it had actual knowledge of the harassment, (2) the harasser was under the university's control, (3) the harassment was based on the victim's sex, (4) the harassment was so severe,

pervasive, and objectively offense that it deprived the victim of access to educational

opportunities or benefits, and (5) the university was deliberately indifferent to the

harassment.  *Davis ex rel. LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S.

629, 650 (1999).  The district court properly entered summary judgment in favor of

the University here because, among other reasons, the University was not

deliberately indifferent.  This Court may also affirm the judgment below on the

alternative grounds that (1) C.H.'s conduct was not so severe, pervasive, and

objectively offensive that it deprived Ms. Luskin of access to educational

opportunities or benefits, or (2) C.H.'s conduct was not based on Ms. Luskin's sex.

## ARGUMENT

### I.    THE STANDARD OF REVIEW IS DE NOVO.

This Court "review[s] the district court's grant of summary judgment de novo,

using the same standard as the district court."  *Neal v. E. Carolina Univ.*, 53 F.4th

130, 144 (4th Cir. 2022) (citing *Goodman v. Diggs*, 986 F.3d 493, 497–98 (4th Cir.

2021)).  The Court "should grant summary judgment only if, taking the facts in the

best light for the nonmoving party, no material facts are disputed and the moving

party is entitled to judgment as a matter of law."  *Id.* (quoting *Goodman*, 986 F.3d

at 497-98.)  "When there's a 'failure of proof concerning an essential element of a

plaintiff's case,' summary judgment is appropriate regardless of the evidence

proving other elements of the claim."  *Neal,* 53 F.4th at 144 (quoting *Haulbrook v.*

*Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001)).  This Court "may affirm the district court's judgment for any reason supported by the record, even if it is not the basis that the district court used."  *United States v. Swann*, 149 F.3d 271, 277 (4th Cir. 1998).

## II.    THE DISTRICT COURT PROPERLY ENTERED SUMMARY JUDGMENT BECAUSE THE UNDISPUTED MATERIAL FACTS DEMONSTRATE THAT THE UNIVERSITY WAS NOT DELIBERATELY INDIFFERENT TO SEXUAL HARASSMENT.

Title IX of the Education Amendments of 1972 prohibits sex discrimination by recipients of federal education funding.  The statute provides, in pertinent part: "No person . . . shall, on the basis of sex, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  The Supreme Court has recognized a private right of action against fund recipients for Title IX violations *committed by the fund recipients*, not third parties.  *Davis,* 526 U.S. at 641-42.  The rationale for limiting Title IX claims to the misconduct of fund recipients is that Title IX was enacted by Congress pursuant to its authority under the Spending Clause.  *Id.* at 639-40.  In return for federal funds, educational institutions agree to comply with federally imposed conditions which must be stated "with a clear voice."  *Id.* at 641; *see also Cummings v. Premier Rehab Keller, PLLC*, 142 S. Ct. 1562, 1570 (2022) (reaffirming concept that Spending Clause legislation

like Title IX is not subject to judicial expansion because it is based on what amounts to a contract between the federal government and fund recipient).

Although the Supreme Court has recognized Title IX claims founded on a school's deliberate indifference to student-on-student sexual harassment, such liability is based on the school's own intentional violations, not on theories of imputed liability, and is founded on sexual harassment or sexual assault, not other forms of student misconduct. *Davis*, 526 U.S. at 641-43; *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288 (1998) (observing that Title IX does not permit recovery in damages where liability rests solely on vicarious liability or constructive notice). To mount such a claim, a plaintiff must demonstrate that the institution was "deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. "If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment. That is, the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Id.* at 644–45. "Funding recipients are deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is *clearly unreasonable* in light

of the *known* circumstances." *Id*. at 648 (emphasis added). In *Davis*, the Supreme Court emphasized that a court could—on a motion to dismiss, for summary judgment, or for a directed verdict—identify a response as not "clearly unreasonable" as a matter of law. *Id.* at 649. Applying these principles, the district court properly entered summary judgment in favor of the University because it was not deliberately indifferent.

### A. University Responses to Ms. Luskin's Reports Were Reasonable.

As soon as Ms. Luskin reported the May 8 text message exchange to OCRSM on May 9, the University immediately took action to address her concerns and halt all contact between C.H. and Ms. Luskin. Ms. Carroll reviewed the complaint, determined that the allegations did not constitute a violation of the Sexual Misconduct Policy & Procedures because they were not based on sex or gender, and referred the matter to the Office of Student Conduct. (J.A. 239-244, J.A. 247, J.A. 252.) On May 10, 2018, Dr. Goodwin received the referral and issued the no contact order on the same day. (J.A. 156-157.) She called C.H. into her office, questioned him about the texts he sent, directed him to have no contact with Ms. Luskin, and told him of the consequences if he violated the no contact order. (J.A. 130-131.) Dr. Zacker also met with C.H. to address Ms. Luskin's complaints. (J.A. 74, J.A. 318-321.) During these meetings, C.H. admitted to sending the texts and agreed to comply with the no contact directive. Furthermore, Ms. Luskin's professors were

made aware of the no contact order and worked with Ms. Luskin so she could take her exams and complete her final projects without having to be in the same room or office with C.H. (J.A. 413-416.)

Similarly, the University took swift and prompt action when informed that C.H. violated the no contact order on October 15, 2018. (J.A. 73-74, J.A. 176-178, J.A. 426, J.A. 428-429, J.A. 612-613.) The University immediately barred C.H. from attending classes and entering academic buildings and labs. (J.A. 177.) He was sanctioned and placed on disciplinary probation. (J.A. 76, J.A. 81, J.A. 177.) The University also assisted in implementing the final peace order and kept Ms. Luskin and C.H. separate and apart. (J.A. 75, J.A. 618.) These actions proved successful; Ms. Luskin had no contact or interactions with C.H. after he violated the no contact order. Issuing a no contact order, advising C.H. about the ramifications of violating that order, informing professors about the no contact directive, and ultimately sanctioning and disciplining C.H. for violating the no contact order constituted a vigilant and robust University response. As a matter of law, the undisputed material facts fail to support a determination that the response was "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S at 648.

To the extent Ms. Luskin argues that the University should have done more or taken different actions in response to Ms. Luskin's reports, Appellant's Br. at 11, 22-25, such alleged failures would represent, at most, negligence and not deliberate

indifference. *See, e.g.*, *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1108 (9th Cir. 2020) (rejecting argument that university acted with deliberate indifference by failing to preclude possibility that accused assailant could harass plaintiff again after she reported the assault); *Maher v. Iowa State Univ.*, 915 F.3d 1210, 1213 (8th Cir. 2019) ("dissatisfaction with the school's response does not mean the school's response can be characterized as deliberate indifference"); *Johnson v. Northeast Sch. Corp.*, 972 F.3d 905, 912 (7th Cir. 2020) ("school administrators are not required to expel every student accused of sexually harassing another student to avoid Title IX liability").

Ms. Luskin is likewise off base in calling the deliberate indifference element a fact-laden question "not generally susceptible to resolution on summary judgment." Appellant's Br. at 20. That view misstates the law. *See I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360, 370 (5th Cir. 2019) ("[Plaintiff's] claim that courts should generally allow juries to decide the question of deliberate indifference is merely an advocacy position not grounded in the law.") (footnote omitted). In *Davis,* the Supreme Court made clear that "deliberate indifference" is appropriately decided on summary judgment. *Davis*, 526 U.S. at 649. Given the exacting and stringent nature of the standard, courts have not hesitated to grant summary judgment in favor of defendants on deliberate indifference claims. *See, e.g.*, *S.B. ex rel. A.L. v. Board of Educ. of Harford County,* 819 F.3d 69, 77 (4th Cir. 2016); *Doe v. Board of Educ.*

*of Prince George's County*, 605 F. App'x 159, 167-68 (4th Cir. 2015); *Foster v. Board of Regents of Univ. of Mich.*, 982 F.3d 960, 965-71 (6th Cir. 2020) (*en banc*); *Garrett v. University of S. Fla. Bd. of Trs.*, 824 F. App'x 959, 964-66 (11th Cir. 2020); *Johnson v. Northeast Sch. Corp.*, 972 F.3d at 911-15; *Ramser v. University of San Diego*, 779 F. App'x 466, 469-70 (9th Cir. 2019); *Maher,* 915 F.3d at 1213.

Authorities Ms. Luskin contends support the view that "deliberate indifference" should go to a jury are distinguishable.  Unlike the University's actions here, administrators in those cases took steps that were clearly "not reasonably calculated to end" the misconduct.  *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 689 (4th Cir. 2018) (University's actions—two listening circles, a generic e-mail, and sending a police officer to escort a threatened student one evening— were not reasonably calculated to end years-long sexual harassment against multiple students); *Roe ex rel. Callahan v. Gustine Unified Sch. Dist.*, 678 F. Supp. 2d 1008, 1038 (E.D. Cal. 2009) ("a rational trier of fact could conclude that [coach's] response of a verbal warning about 'childish behavior,' without more, was clearly unreasonable when there is sufficient evidence in the record to support a claim that [coach] was on notice that the offenders were sexually assaulting players with an air hose"); *Theno v. Tonganoxie Unified Sch. Dist. No. 464*, 394 F. Supp. 2d 1299, 1311 (D. Kan. 2005) (noting that "a sufficiently significant number of school

administrators essentially turned a blind eye to the harassment by ignoring, tolerating, or trivializing" it).

### B. The Determination that C.H.'s Conduct Did Not Constitute Sexual Harassment Was Not Clearly Unreasonable.

Ms. Luskin's principal argument concerning the University's alleged deliberate indifference is that it applied general student misconduct procedures to her complaints about C.H. rather than its Sexual Misconduct Policy & Procedures. Appellant's Br. at 22-24.[12] She suggests that the University should have investigated C.H. for sexual harassment or stalking under those Sexual Misconduct Policy & Procedures. Appellant's Br. at 22-24. But because the University's classification of Ms. Luskin's complaint was not clearly unreasonable based on the circumstances presented to it, and its classification of the complaint did not affect the effectiveness of the University's overall response, her argument fails.

The University's sexual misconduct procedures apply to all "Title IX complaints made in connection with University programs and activities." (J.A. 36.)

---

[12] Plaintiff errantly contends that the University recognized Ms. Luskin's complaint about C.H. as a Title IX matter involving sexual harassment but failed to apply the right policy, inaccurately stating that the University "designated" her report as "Title IX/Sexual Misconduct." Appellant's Br. at 8, 22. In reality, however, while Ms. Luskin reported the parties' May 8 text message exchange to OCRSM, the University never "designated" her report as sexual misconduct or a Title IX matter. (J.A. 163, J.A. 116-117, J.A. 246-247.) And although Ms. Luskin argues that Sgt. Mable called C.H.'s behavior "basic stalking/harassment," Sgt. Mable did not oversee or implement the University's Sexual Misconduct Policy & Procedures or the Code.

To form the basis for a Title IX claim, peer harassment must be based on sex or be "gender-oriented." *Davis*, 526 U.S. at 651. Here, University administrators made the decision—based on their years of experience handling student conduct matters and their knowledge of University policies—that Ms. Luskin's reports did not allege sexual or sex-based misconduct. Ms. Carroll, OCRSM's Director, reviewed Ms. Luskin's May 9, 2018, report to OCRSM, and in accordance with the Student Sexual Misconduct Complaint Procedures, conducted an initial assessment; she determined that the reported conduct did not constitute a violation of the Sexual Misconduct Policy & Procedures because the actions did not involve gendered language or sexual elements. (J.A. 54, J.A. 239, J.A. 241-244, J.A. 252.) Dr. Goodwin concurred with Ms. Carroll's assessment. (J.A. 151, J.A. 163-164.)

Likewise, Ms. Luskin's and Eli Mizarchi's earlier April complaints to the BETA team did not clearly allege conduct based on her gender or sex. And Ms. Luskin admits that none of C.H.'s comments was sexual in nature. (J.A. 382.) Both Ms. Luskin and Mr. Mizarchi reported C.H.'s conduct to the BETA team, and both expressed concern about C.H.'s conduct toward both of them. (J.A. 564-565.) All of Ms. Luskin's and Mr. Mizarchi's reports and all of Dr. Goodwin's and Dr. Zacker's discussions with C.H. indicated that C.H. perceived that he was being excluded by other graduate students and believed Ms. Luskin to be the leader of the group from which he was left out. Thus, the University's decision to apply its regular

student conduct procedures instead of its sexual misconduct procedures was reasonable.

Even assuming, for the sake of argument, that University administrators erred in treating Ms. Luskin's complaints about C.H.'s conduct as general student misconduct instead of sexual misconduct, such an error does not amount to deliberate indifference under Title IX. Courts have held that an institution's failure to follow its own internal Title IX policies or procedures does not establish deliberate indifference. *See, e.g., Karasek*, 956 F.3d at 1107 (university's failure to follow its own policies was not deliberately indifferent); *Doe v. Board of Educ. of Prince George's County*, 605 F. App'x at 168 (affirming summary judgment for defendant and agreeing "with the district court that the Board's failure to strictly adhere to its sexual harassment policies . . . is not determinative" of deliberative indifference); *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 169 (5th Cir. 2011); *see also Gebser*, 524 U.S. at 292 (school district's alleged failure to comply with federal title IX regulations "does not establish the requisite . . . deliberate indifference").

Significantly, Ms. Luskin advances no contention that the University's decision to treat C.H's conduct under the Code—rather than as sexual harassment or stalking under the Sexual Misconduct Policy & Procedures—resulted in any practical differences in the remedies she received. Nor could she, because the University's

response to Ms. Luskin's complaints about C.H. were similar to the actions it would have taken under its Sexual Misconduct Policy & Procedures, including issuing a no contact order, talking with the parties and their professors, implementing measures to keep the parties separate and apart, and, when C.H. violated the no contact order, implementing further safety measures (such as having C.H. evaluated by the University's psychiatrist, prohibiting him from taking classes with Ms. Luskin and entering her research lab, and restricting C.H.'s access to common facilities), and placing C.H. on disciplinary probation.  (J.A. 45-46 (noting interim protective measures that the University may implement following a report of sexual misconduct), 63-64 (describing remedies and sanctions under student sexual misconduct complaint procedures).)  Dr. Goodwin testified that a student found responsible for stalking or sexual harassment under the Sexual Misconduct Policy & Procedures would typically receive the sanction of disciplinary probation (J.A. 111, J.A. 113), the very discipline imposed on C.H. for violating the no contact order.

Asked whether Ms. Luskin would "have received a different process" if her complaint had been considered a Title IX or sexual misconduct matter rather than a student conduct matter, Dr. Goodwin said that the "process used for adjudication might have been different, but it still would have been adjudicated through the [O]ffice of [S]tudent [C]onduct" and that the Office of Student Conduct process is simpler and faster.  (J.A. 519.)  The Director of Student Conduct is responsible for

32

determining disciplinary sanctions in student sexual misconduct cases. (J.A. 62-63.) Moreover, because C.H. admitted to violating the no contact order, an investigation into whether he violated it was unnecessary. (J.A. 515 ("we already had all the information that we needed, it had come out that he had . . . violated the no contact order, so I'm not sure what an investigation would have showed that would have changed the outcome in terms of discipline for him.").) Indeed, as set forth above, the University implemented the same remedies it would have provided under its Sexual Misconduct Policy & Procedures.

### C.    The University Was Not Deliberately Indifferent in Declining to Implement Ms. Luskin's Preferred Disciplinary Sanctions.

Although Ms. Luskin wanted the University to suspend or expel C.H. after he violated the no contact order, Appellant's Br. at 11, an institution is not liable for deliberate indifference for failing to implement a plaintiff's preferred disciplinary action. *See Davis,* 526 U.S. at 648 (noting that Title IX does not require that institutions "engage in particular disciplinary action" and that victims of peer harassment do not "have a Title IX right to make particular remedial demands"); *S.B. ex rel. A.L.*, 819 F.3d at 77 ("school's actions do not become 'clearly unreasonable' simply because a victim . . . advocated for stronger remedial measures"). "*Davis* sets the bar high for deliberate indifference." *Id.* at 76. "[I]t is not enough that a school has failed to eliminate student-on-student harassment, or to impose the disciplinary sanctions sought by a victim." *Id.* (citing *Davis*, 526 U.S.

at 642).    To avoid liability, the institution is not required "to 'remedy' peer harassment' and 'to ensur[e] that students . . . conform their conduct to' certain rules." *Davis*,  526 U.S. at 648  (internal citations omitted).  "A showing that [a school] did not employ the best practices or even that it was negligent is insufficient" to establish deliberate indifference.  *Butters v. James Madison Univ.*, 208 F. Supp. 3d 745, 755 (W.D. Va. 2016).  "Even in cases where universities have done seemingly little in response to a complaint of sexual assault, courts have held there was no deliberate indifference." *Id.*  (citing cases).

No reasonable juror could find that the University's response was "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S at 648.  Based on the information available to them—which included reports by Ms. Luskin and other graduate students and the administrators' conversations with C.H.—multiple University administrators determined that C.H.'s conduct was not based on Ms. Luskin's sex and was not sexual misconduct.  The response and remedies provided to Ms. Luskin were largely the same as she would have received had the University applied its Sexual Misconduct Policy & Procedures.  Because no reasonable jury could conclude that the University responded with deliberate indifference to Ms. Luskin's complaints about C.H., the district court properly granted summary judgment.

III.  **THE JUDGMENT SHOULD BE AFFIRMED FOR THE ALTERNATIVE REASONS THAT C.H.'S CONDUCT WAS NOT SO SEVERE, PERVASIVE, AND OBJECTIVELY OFFENSIVE THAT IT DEPRIVED MS. LUSKIN OF ACCESS TO EDUCATIONAL OPPORTUNITIES OR BENEFITS *AND* WAS NOT BASED ON HER SEX.**

### A.  No Reasonable Juror Could Find that Ms. Luskin Met the Applicable Standard.

In the alternative, no reasonable juror could conclude that C.H.'s conduct was so severe, pervasive, and objectively offensive that Ms. Luskin was deprived of educational opportunities or benefits.  *See Davis,* 526 U.S. at 650-51.  To meet this high standard, conduct must create an environment that a reasonable person would find hostile or abusive, considering such factors as "whether the harassment was frequent, severe, humiliating, or physically threatening, and whether it effectively deprived the victim of educational opportunities or benefits." *Jennings v. University of N.C.,* 482 F. 3d 686, 696 (4th Cir. 2007).  "[T]he behavior must be serious enough to have the systemic effect of denying the victim equal access to an education program or activity."  *Davis,* 526 U.S. at 653.  "Whether gender-oriented conduct rises to the level of actionable 'harassment' . . . 'depends on a constellation of surrounding circumstances, expectations, and relationships.'"  *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 82 (1998)).  Such factors include "the ages of the harasser and the victim and the number of individuals involved," *Davis,* 526 U.S. at 651, and the relationship between the harasser and

victim, *id*. at 653.  Peer harassment is less likely to deprive a victim of educational

benefits than teacher-student harassment.  *Id*.

The conduct at issue here consisted of four brief interactions over the course

of eight months, none of which involved C.H. threatening to hurt Ms. Luskin,

physically touching her, or making humiliating comments.  First, Mr. Mizrachi

reported that, on February 13, 2018, C.H. punched a wall, yelled, and cursed at a

*group* of graduate students, including Ms. Luskin, because he thought they were

laughing at him.  Two months later, on April 12, 2018, C.H. expressed hurt feelings

and anger in a conversation with Ms. Luskin in their shared office because he

believed that she and other graduate students were excluding him, ignoring him, and

making fun of him.  C.H. then followed up with a text message asking that Ms.

Luskin not tell other students about the conversation because, he said, "I don't want

to feel like you've been gossiping and making fun of me with your group, especially

Eli." (J.A. 10, J.A. 567, J.A. 572.)  Approximately one month later, on May 8, 2018,

C.H. and Ms. Luskin exchanged a series of text messages wherein C.H. again angrily

asked Ms. Luskin why she was excluding him from the group.  Following Ms.

Luskin's report about that exchange, the University immediately issued a no contact

order to C.H. and worked with the students' professors to keep them apart.  Finally,

on October 15, 2018, C.H. expressed anger when speaking to Mr. Pearson while Ms.

Luskin was present—in violation of the no contact order—and Ms. Luskin and other

male students saw him "sort of circling" them and following them at a distance, when they reported his conduct to police and the Title IX office. (J.A. 689, J.A. 691.)

C.H. never made any threats against Ms. Luskin or physically touched her; he only expressed anger and blamed her for his feelings of exclusion. Such conduct is not severe, pervasive, and objectively offensive, and the district court erred in finding that it was. (J.A. 544-555.) *See, e.g., Doe v. University of Ky.*, 959 F.3d 246, 252-53 (6th Cir. 2020) (while plaintiff alleged that her assailant stared at her, stood by her at a party, followed her home, sat near her in the library, and stared at her during their shared classes, "[n]othing about these allegations . . . suggest [sic] *sexual* harassment, let alone sexual harassment that is of a severe, pervasive, and objectively offensive nature") (emphasis in original); *Frazer v. Temple Univ.*, 25 F. Supp. 3d 598, 614 (E.D. Pa. 2014) (allegation that harasser student continued to follow plaintiff around and stare at her between the time she filed harassment complaint and university held disciplinary hearing did not constitute severe, pervasive, and objectively offensive harassment).

The district court correctly determined that a reasonable jury could not find that C.H.'s conduct deprived Ms. Luskin of access to any University educational opportunity or benefit. To establish such a claim, a plaintiff must prove sex-based harassment under circumstances such as

when the harassment (1) results in the physical exclusion of the victim from an educational program or activity; (2) "so undermines and detracts from the victim['s] educational experience" as to "effectively den[y her] equal access to an institution's resources and opportunities"; or (3) has "a concrete, negative effect on [the victim's] ability" to participate in an educational program or activity.

*Jennings,* 482 F.3d at 699 (quoting *Davis*, 526 U.S. at 650-51, 654). "Physical exclusion" might occur if, for example, "male students physically threaten their female peers every day, successfully preventing the female students from using a particular school resource." *Davis,* 526 U.S. at 650-51.

A reasonable juror could not find that C.H.'s conduct deprived Ms. Luskin of access to educational opportunities or benefits. Following issuance of the no contact order, Ms. Luskin was permitted to move her office, take exams, and complete projects without being in the same room with C.H. No problems thereafter occurred until C.H. violated the no contact order on October 15, 2018, after which the University immediately barred him from attending classes and entering academic buildings, ordered him to see a psychiatrist, and disciplined him. Although Ms. Luskin later decided to get a master's degree instead of a Ph.D., she remained enrolled in the University in the same department and admits that she maintained consistently good grades and otherwise performed well academically throughout this time.

Overreaching in her citation to *Jennings,* Ms. Luskin argues that, despite her "consistently good" grades and research, a jury could find that she was denied

educational benefits or opportunities.  Appellant's Br. at 18.  In *Jennings,* however, this Court determined that a jury could find that a school coach's "severe and pervasive sexual harassment concretely and negatively affected her ability to participate in the soccer program," which in turn had "a negative impact on her . . . academic performance."  482 F.3d at 699.  There, plaintiff's grade point average improved only slightly from 1.964 to 2.022, which was "barely above passing," and her "subpar academic performance g[ave] substance to [plaintiff's] testimony that her GPA was so low because the hostile soccer environment made it difficult for her to focus on her studies."  *Id.*  at 700.  Here, by contrast, no evidence establishes that C.H.'s conduct had any negative effect on Ms. Luskin's academic performance.  Significantly, *Jennings* notes that plaintiff's psychiatrist found that the coach's "verbal sexual abuse caused her to suffer severe emotional distress."  *Id.* at 699  Although Ms. Luskin claims that the "anxiety and distress" caused by C.H.'s conduct "caused her to seek mental health treatment, even before C.H. violated the No Contact Order," Appellant's Br. at 15, her therapist's notes summarizing their first session on September 24, 2018, do not mention C.H., anxiety, or her fear of anyone (J.A. 753-754).

Similarly unavailing is the focus on the fact that Ms. Luskin chose to leave the University in the spring of 2019 with a master's degree in Chemical Physics.  Appellant's Br. at 16; (J.A. 353-354).  Ms. Luskin claims to have decided to switch

to the master's track sometime after obtaining the peace order in October 2018. (J.A. 434-435.) But the record fails to show that C.H.'s conduct so distressed Ms. Luskin that she felt forced to drop out of the University mid-semester. Nor did she. Instead, she successfully finished her coursework and research during both the fall 2018 and spring 2019 semesters and had no further contact with C.H. after he violated the no contact order. Less than a year after leaving the University, toward the end of 2019, Ms. Luskin decided to re-enroll in the program. (J.A. 352-353.)

Because no reasonable juror could find C.H.'s conduct so severe, pervasive, and objectively offensive that it deprived Ms. Luskin from accessing an educational opportunity or benefit, the University stands entitled to judgment on this alternative ground. *See Swann*, 149 F.3d at 277 (providing that court may affirm for any reason appearing in the record).

### B. C.H.'s Conduct Toward Ms. Luskin Was Not Based on Her Sex.

Record evidence demonstrates that C.H.'s conduct was motivated by his feeling ridiculed, ignored, excluded, and isolated from the other graduate students and by his belief that Ms. Luskin was a social leader of the student group. His behavior was not based on Ms. Luskin's gender or sex. "Context is crucial, and the ultimate question is whether the object of the harassment was treated differently *because of their gender*." *Doe v. University of Chicago*, No. 16 C 08298, 2017 WL 4163960, at *8 (N.D. Ill. Sept. 20, 2017). "Harassment, 'even harassment

40

between men and women' is not automatically considered to be gender-based discrimination 'merely because the words used have sexual content or connotations.'" *Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 362 (S.D.N.Y. 2017) (quoting *Oncale,* 523 U.S. at 80 (dismissing plaintiff's Title IX claim where alleged harasser's conduct was motivated by "personal animus," rather than the plaintiff's sex)); *see also Seamons v. Snow*, 84 F.3d 1226, 1233 (10th Cir. 1996) (dismissing Title IX claim because alleged facts showed that any harassing conduct occurred because the harassers felt the plaintiff betrayed them); *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000) (holding that plaintiff was not subjected to a hostile environment for purposes of Title VII because "[w]hile he may have been subject to intimidation, ridicule, and mistreatment, he has not shown that he was treated in a discriminatory manner because of his gender"); *Sanches*, 647 F.3d at 165-66 (concluding that conduct consisting of a single instance of calling someone a "ho," slapping an individual's buttock, and starting rumors that one person was pregnant and another had a hickey on her breast is more properly described as teasing or bullying than sexual harassment).

Here, no evidence exists from which a reasonable juror could infer that C.H. made explicit or implicit proposals of sexual activity to Ms. Luskin, touched her, or made sexually charged comments to her. Indeed, it is undisputed that C.H. never made comments to Ms. Luskin that were sexual in nature, referenced her gender, or

suggested that he wanted to date her. Ms. Luskin admits that she does not even know if C.H. dates women. (J.A. 422-423.) Instead, the text messages exchanged between C.H. and Ms. Luskin relate to C.H.'s belief that he was being socially excluded from the graduate student group. He told Ms. Luskin that he thought that he and Ms. Luskin would become "good friends," given their small academic program. No evidence in the record shows that C.H. wanted a romantic relationship with Ms. Luskin. In the May 8 text message exchange—after Ms. Luskin, apropos of nothing, volunteered that she was in a serious relationship—C.H. suggested that he would like to be in a relationship with "someone." He did not suggest that "someone" was Ms. Luskin. Finally, although Ms. Luskin reported to the Title IX office that C.H. complimented her looks, Ms. Luskin clarified during her deposition that the only statement C.H. made even remotely about her physical appearance was his question about why she was wearing a ring on her index finger; that comment was non-sexual and gender neutral. (J.A. 556, J.A. 406-408, J.A. 433.)

Significantly, C.H. also discussed and directed his comments and conduct toward male students, Eli Mizrachi and Donny Pearson. In his text message to Ms. Luskin on April 12, 2018, C.H. asked that Ms. Luskin not tell Mr. Mizrachi and other students about their in-person conversation because he did not want to feel like Ms. Luskin was "gossiping and making fun of [C.H.] with [her] group, especially Eli [Mizrachi]." (J.A. 10, J.A. 567, J.A. 572.) When C.H. violated the no contact

42

order, nothing suggested that the violation was based on Ms. Luskin's sex or gender. C.H. approached Ms. Luskin and her new officemate, Mr. Pearson, at their office and directed his conversation towards Mr. Pearson. (J.A. 418-419, J.A. 718.) Both Mr. Pearson and Ms. Luskin filed police reports complaining about C.H.'s behavior towards them. (J.A. 718.)

Authorities that have found harassment on the basis of sex or gender stand clearly distinguishable from this case. *See, e.g., Jennings*, 482 F.3d at 695 (male soccer coach who continuously bombarded players with crude questions and comments about their sexual activities and commented on their breasts and butts engaged in sexual harassment because he subjected his players to sex-specific language that was aimed to humiliate, ridicule, or intimidate them); *Doe v. Board of Educ. of Prince George's County,* 982 F. Supp. 2d 641, 651 (D. Md. 2013) (reasonable juror could conclude that conduct including directing "humping movements" to plaintiff, exposing himself to plaintiff, calling plaintiff "gay," making sexual remarks to plaintiff, and pressuring plaintiff to engage in "oral and/or anal sex with him in the classroom and/or bathroom" involved "proposals of sexual activity, offensive touching of a sexual nature, and sexually charged comments" and therefore harassment that "stemmed from sexual desire"), *aff'd*, 605 F. App'x 159.

Because a reasonable jury could not conclude that C.H.'s conduct was based on Ms. Luskin's sex or gender, Title IX does not apply, and the University is entitled to judgment on her claim for this alternative reason. *See Swann*, 149 F.3d at 277.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Kathryn J. Bradley
_____
KATHRYN J. BRADLEY
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 17th Floor
Baltimore, Maryland 21202
kbradley@oag.state.md.us
(410) 576-6449
(410) 576-6437 (facsimile)

Attorneys for Appellee

44

## REQUEST FOR ORAL ARGUMENT

Appellee respectfully requests that the Court hear oral argument. Appellee submits that oral argument would aid the Court in its disposition of this appeal.

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 10,607 words, excluding the parts of the brief exempted by Rule 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen point, Times New Roman.

/s/ Kathryn J. Bradley

_____

Kathryn J. Bradley

## TEXT OF PERTINENT PROVISIONS

**United States Code**

**28 U.S.C. § 1681**

**(a) Prohibition against discrimination; exceptions**

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

|  |  |  |
|---|---|---|
| JAMIE LUSKIN, | * | |
| *Plaintiff-Appellant*, | * | |
| v. | * | No. 22-1910 |
| UNIVERSITY OF MARYLAND, COLLEGE PARK, | * | |
| *Defendant-Appellee*. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## CERTIFICATE OF SERVICE

I certify that, on this 15th day of December, 2022, the Brief of Appellee was filed electronically and served on counsel of record who are registered CM/ECF users, including:

> Rignal W. Baldwin V, Esq.
> 111 South Calvert Street
> Suite 1805
> Baltimore, Maryland 21202
> rbaldwinv@baldwin-seraina.com

/s/ Kathryn Bradley

_____

Kathryn Bradley